UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

DRAKE JOSEPH GEISLER                                  CIVIL ACTION

VERSUS                                                           NO. 19-13658

LOUISIANA STATE ET AL.                              SECTION "M"(2)

## REPORT AND RECOMMENDATION

This is a civil action brought by Drake Joseph Geisler ("Geisler") under 42 U.S.C. § 1983 against the State of Louisiana, the Terrebonne Parish Criminal Justice Complex, Sheriff Jerry Larpenter ("Larpenter"), Major Stephen Bergeron ("Bergeron"), Terrebonne Parish President Gordon Dove ("Dove") and Lieutenant T. Schwaush ("Schwaush").[1] Geisler is currently incarcerated in the Claiborne Parish Detention Center in Homer, Louisiana. He filed his complaint *pro se* and *in forma pauperis* pursuant to § 1983 asserting claims arising solely from his period of incarceration in the Terrebonne Parish Criminal Justice Complex ("the Terrebonne jail") in Houma, Louisiana from August through December 2019.

In a partial dismissal order issued on April 21, 2020, U.S. District Judge Barry Ashe dismissed with prejudice the claims against defendants Dove, Terrebonne Parish Criminal Justice Complex and State of Louisiana. ECF No. 27.  United States Magistrate Judge Joseph C. Wilkinson conducted a telephone conference in this matter on May 13, 2020.  ECF No. 28.[2] Participating in that conference were Geisler, *pro se,* and William Dodd, counsel for defendant Larpenter.  Plaintiff was sworn and testified for all purposes permitted by *Spears v. McCotter*, 766 F.2d 179 (5th Cir. 1985), *overruled on other grounds by Neitzke v. Williams*, 490 U.S. 319 (1989), and its progeny. Following the *Spears* hearing, Judge Wilkinson ordered that the remaining

---

[1] The case was reassigned to me on June 2, 2020 (ECF No. 29).
[2] Plaintiff's sworn testimony was electronically recorded during the *Spears* hearing held on May 13, 2020.

defendants file motions for summary judgment by July 7, 2020 and that Plaintiff file any response to such motions by August 6, 2020. ECF Nos. 30, 33. Defendants Larpenter, Bergeron and Schwausch filed a motion for summary judgment on June 30, 2020. ECF No. 34. Plaintiff has not filed any response to the motion for summary judgment.

## I.    **BACKGROUND**

### A.    **Factual Allegations**

Geisler alleges generally that, during his time in the Terrebonne jail, defendants "imposed a substantial burden" on his right to exercise his Messianic Jewish religion when they failed to provide him with a kosher diet. ECF No. 1, ¶ IV, at 5. In his statement of facts, Geisler states that he was "forced to defil[e] his conscience" daily in the Terrebonne jail by eating unclean and non-kosher food in the jail. ECF No. 14, at 3. He alleges that after he filed multiple written grievances with jail officials, he was informed that he would receive a kosher diet, but prison officials subsequently told him that "a kosher diet cannot be provided" at the facility. ECF No. 14, at 4. Geisler further complains that he was slandered on Facebook and in a local newspaper for filing the present lawsuit. *Id.* Geisler seeks monetary relief, a proper kosher diet and religious and mental health counseling. ECF No. 1, ¶ V, at 5.

### B.    *Spears* **Hearing Testimony**

During his *Spears* hearing, Geisler testified that he is 26 years old, quit school in the tenth grade, and earned his GED in prison. He was incarcerated in August 2019 after he violated his parole from a prior offense and was convicted of aggravated second-degree battery in December 2019. He was sentenced to two years in prison followed by 4.5 years of parole, and his release date is May 30, 2021. He was incarcerated at the Terrebonne Parish jail from approximately August 2019 through December 2019. His claims arise from his incarceration at that facility.

Geisler testified that he was denied his constitutional right to practice his Messianic Jewish religion when Terrebonne jail officials did not provide him with a kosher diet. Geisler testified that he was "born into" the Messianic Jewish faith on his father's side of the family. According to Geisler, Messianic Jews believe in God, believe that Jesus Christ is the Son of God, follow the Bible, engage solitary or group prayer, and attend synagogue and church services. He stated that unlike Christians, Messianic Jews have kosher dietary restrictions and focus more on the Bible's Old Testament teachings than those of the New Testament.

Geisler testified that between 2009 and 2016, he lived in Morgan City, Louisiana, and attended a synagogue in Lafayette, Louisiana. A rabbi presided over the services he attended at the Lafayette synagogue. Geisler testified that the Lafayette synagogue ultimately was shut down. He said that he could not remember the name of the synagogue or why it was shut down and that he would need to "look it up" or ask his mother to look up this information. Geisler testified that at one point, he went to the Lafayette synagogue every week, but later reduced his visits to once a month. When he was released from prison for a prior offense in 2018, he initially was religiously observant. He testified that when he was not incarcerated, he would go to synagogue on Wednesdays, church on Sundays, and would attend "prayer circles" on Tuesdays and Thursdays. He testified that between January and July 2019, he was not religiously observant because of his drug use.

Geisler testified that the Terrebonne jail offered no formal religious services. He stated that the only way for him to practice his Messianic Jewish faith at the Terrebonne jail was to read his Bible, pray by himself, or pray with other people in a prayer circle. He stated that he bought a Bible from the prison commissary for $25.

Geisler testified that, under the Messianic Jewish kosher diet, his food is supposed to be brought to him by a priest or a rabbi. He stated that it was acceptable for a priest to bring him food in prison because certain facilities do not have rabbis. Geisler stated that rabbis and priests are similar because "rabbi" means "teacher" and a priest is "a teacher of the Bible." Geisler described kosher food generally as "real food" that is clean, unprocessed, and cooked without pesticides. He stated that under his kosher diet he can eat fresh fruits and vegetables, beans and rice, bread made without yeast, beef, turkey, and fish, but cannot eat processed foods, shellfish, pork or food treated with additives, preservatives or pesticides. He stated a person can obtain "a packet-long list" of kosher foods from a doctor. In describing how kosher Jews define "processed" foods, plaintiff testified by way of example that he can eat "chicken on a bone" but not boneless chicken meat that has been processed through a machine and/or made into a patty.

Geisler testified that during his five-month incarceration at the Terrebonne jail, he ate "the same thing everybody else ate," including beans and rice, processed patties, foods treated with pesticides and pudding made with additives and preservatives. He stated that he was able to eat the beans and rice provided to him by the Terrebonne jail under his kosher diet. He said that the Terrebonne jail did not provide him with fresh fruit and vegetables and instead gave him steamed broccoli, carrots, and peas that he could not eat because they were cooked with pesticides. Geisler testified that he knew the steamed vegetables were cooked with pesticides because he worked in the kitchen as a trustee and saw that the vegetables "came out of a bag." He stated that other than the beans and rice, he could not eat any of the food provided by the Terrebonne jail under his kosher diet. He stated that he nonetheless ate the non-kosher food because "he had to eat" and "couldn't starve."

Geisler testified that he asked for a kosher diet from several jail employees, including the warden, deputies, kitchen workers, and nurse. He stated that he utilized the administrative grievance procedure at the Terrebonne jail to request a kosher diet. He said that he made his first formal request for a kosher diet with a prison lieutenant, who advised plaintiff that such a diet would be provided. Plaintiff stated that he was subsequently given a diabetic food tray, consisting of wheat bread, a "regular orange," the same pudding with additives and preservatives from his previous tray, and something that looked like the patty from his previous tray but was slightly different in substance and lacked gravy. He stated that he could eat the orange provided on the diabetic tray under his kosher diet. Geisler testified that he informed prison officials that a diabetic diet was not synonymous with a kosher diet and made a second formal request for a kosher diet to a prison lieutenant. He testified that the lieutenant denied his request, stating that such a diet could not be provided by the Terrebonne jail. He testified that he appealed the denial to the warden. According to Geisler, the warden denied his appeal, and his appeal ended there.

Geisler testified that he bought several non-kosher items from the commissary at the Terrebonne jail, including sausage, hot and spicy chili, chicken ramen noodles, peanut butter, cocoa mix, pork skins, honey buns, French pastries, chicken tortilla soup, blueberry tarts and jolly ranchers. Geisler testified that the only non-kosher items he consumed from his commissary purchases were a soup or two a day and maybe some noodles and that the remaining non-kosher items he purchased from the commissary were used to "pay" for his unauthorized tattoos at the Terrebonne jail. He said that the commissary soups were "more kosher than the food they fed [him]" from the prison kitchen. He testified that the food from the commissary was in packages and conceded these items were processed food. He stated that he "had to eat something" and that the Terrebonne jail "didn't have much kosher on commissary." Geisler testified that he suffered

no physical injuries as a result of not receiving a kosher diet but did suffer injuries to his "conscience" and "beliefs" based on the violation of his constitutional right to practice his Messianic Jewish religion.

Geisler testified that an attorney for defendants slandered him in the newspaper after he filed the present lawsuit. His mother informed him that a newspaper article was posted on Facebook and reflected the opinion of defendants' attorney that the religious claims made in this lawsuit lacked merit. Geisler stated that the attorney went on the record in the article, stating that the diet plaintiff received at the Terrebonne jail "is kosher enough for rest of world, just not for Drake Geisler." Geisler testified that he suffered no physical injuries from the statements made in the newspaper article, however, his mother was embarrassed after "seeing him file lawsuit for something he is entitled to" and plaintiff was embarrassed as a result of his mother's embarrassment. He stated that the article was "making it look like I am in the wrong."

### C.    Defendants' Statement of Uncontested Material Facts and Affidavits

In support of their Motion for Summary Judgment, Defendants Larpenter, Bergeron and Schwausch submitted (1) a Statement of Uncontested Material Facts (ECF No. 34-12); (2) individual Affidavits of Larpenter, Schwausch and Bergeron (ECF Nos. 34-2, 34-3 and 34-7); (3) the affidavit of Mordina F. Jack, food service supervisor for the Terrebonne jail (ECF No. 34-8;  and (4) the affidavit of Barbara Wakeen, a food service/nutrition consultant (ECF No. 34-10). Schwausch (the Grievance Officer in charge of responding to inmate requests and grievances) stated that he received two requests for a kosher diet from Geisler, on October 9 and October 10, 2019, based on his religion.  ECF No. 34-12, ¶¶ 1 and 2. On October 14, 2019, Schwaush advised the kitchen at the Terrebonne jail of Geisler's request. *Id.* ¶ 3. Pursuant to Geisler's request,

defendants claim that the kitchen staff obtained what was needed for a kosher diet and provided it to Geisler. *Id.* ¶ 4.

According to Schwaush, Geisler's October 9, 2019 request advised that he could not eat yeast in bread as it was against his religion. ECF No. 34-3, at 1. He received another request on October 10, advising that Geisler desired a kosher diet. *Id.* Schwaucsch avers that Geisler was provided with what the jail understood to be a kosher diet, but Geisler then complained that the diet was high fiber or was simply a diabetic diet. *Id.* at 2. Schwaush notes that Geisler did not advise the facility of his kosher diet needs when he was first admitted, but only did so after he had been in the jail for three months. *Id.* at 1. After he did complain, the jail made reasonable attempts to provide him with such a diet for the two months that he remained in the facility before being transferred.

Defendant Larpenter, Sheriff of Terrebonne Parish, avers that he is only familiar with Geisler because he received a copy of the complaint. ECF No. 34-7, at 1. He states that he has been satisfied with the performance of correctional food services during the last 12 years and that to the best of his knowledge, all reasonable efforts were made to accommodate Geisler's religious requests. *Id.* at 2.

Defendant Bergeron, the warden of the Terrebonne jail, avers that he is aware through conversations with Lieutenant Schwaush that, after three months of incarceration, Geisler requested a kosher diet. ECF No. 34-2, at 1. He avers that the jail attempts to accommodate religious requests to the extent that the practice does not cause safety concerns. *Id.* at 2. He avers that he is personally aware that a request was made to the jail's food service operator, Correctional Food Services, for their dietician to prepare a kosher diet for Geisler, and that same was provided. *Id.*

By affidavit, Mordina Jack, the Food Service Supervisor for the Terrebonne jail, avers that she received the request for a kosher diet for Geisler and that she forwarded the request to Correctional Food Services, and it subsequently provided the kosher diet prepared by the company's food service/nutrition consultant to Geisler. ECF No. 34-8. This is confirmed by the affidavit of Barbara Wakeen, the food service/nutrition consultant who received and processed the request. ECF No. 34-10.

## II.   LEGAL STANDARD

### A.   Statutorily Required Screening

A prisoner's *pro se* complaint must be screened by the court as soon as practicable after docketing.[3]  Complaints by prisoners must be dismissed upon review if they are frivolous and/or fail to state a claim.[4]  The law "'accords judges not only the authority to dismiss a claim based on an indisputably meritless legal theory, but also the unusual power to pierce the veil of the complaint's factual allegations and dismiss those claims whose factual contentions are clearly baseless.'"[5]  "A federal court may dismiss a claim *in forma pauperis* 'if satisfied that the action is frivolous or malicious.'"[6]  A complaint is frivolous "if it lacks an arguable basis in law or fact."[7]

The purpose of a *Spears* hearing is to dig beneath the conclusory allegations of a *pro se* complaint, to ascertain exactly what the prisoner alleges occurred and the legal basis of the claims.[8] "[T]he *Spears* procedure affords the plaintiff an opportunity to verbalize his complaints, in a manner of communication more comfortable to many prisoners."[9]  The information elicited at such

---

[3] 28 U.S.C. § 1915A(a); *Martin v. Scott*, 156 F.3d 578, 579–80 (5th Cir. 1998).
[4] 28 U.S.C. § 1915A(b)(1); *see also id.* § 1915(e)(2)(B).
[5] *Macias v. Raul A. (Unknown), Badge No. 153*, 23 F.3d 94, 97 (5th Cir. 1994) (quoting *Neitzke v. Williams*, 490 U.S. 319, 327 (1989)).
[6] *Moore v. McDonald*, 30 F.3d 616, 620 (5th Cir. 1994) (quoting former 28 U.S.C. § 1915(d), now incorporated in 28 U.S.C. § 1915(e), as amended).
[7] *Davis v. Scott*, 157 F.3d 1003, 1005 (5th Cir. 1998); *Reeves v. Collins*, 27 F.3d 174, 176 (5th Cir. 1994).
[8] *Spears*, 766 F.2d at 180.
[9] *Davis*, 157 F.3d at 1005.

an evidentiary hearing is in the nature of an amended complaint or a more definite statement under FED. R. CIV. P. 12(e).[10] "Upon development of the actual nature of the complaint, it may also appear that no justiciable basis for a federal claim exists."[11]

The court may make only limited credibility determinations in a *Spears* hearing, and it may consider and rely upon documents as additional evidence, as long as they are properly identified, authentic and reliable.[12] "The Court should allow proper cross-examination and should require that the parties properly identify and authenticate documents."[13]

After a *Spears* hearing and its concurrent opportunity to expound the claim, a complaint may be dismissed for failure to state a claim or as legally frivolous if it lacks an arguable basis in law[14] or "as factually frivolous only if the facts alleged are 'clearly baseless,' . . . [or] when the facts alleged rise to the level of the irrational or wholly incredible."[15] A complaint fails to state a claim on which relief may be granted when the plaintiff does not "plead enough facts to state a claim to relief that is plausible on its face. Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."[16] "'A complaint lacks an arguable basis in law if it is based on an indisputably meritless legal theory, such as if the complaint alleges the violation of a legal interest which clearly does not exist.'"[17] "When a complaint raises an arguable question of law which the

---

[10] *Wilson v. Barrientos*, 926 F.2d 480, 481 (5th Cir. 1991); *Adams v. Hansen*, 906 F.2d 192, 194 (5th Cir. 1990).

[11] *Spears*, 766 F.2d at 182.

[12] *Norton v. Dimazana*, 122 F.3d 286, 292 (5th Cir. 1997) (citing *Cay v. Estelle*, 789 F.2d 318, 326–27 (5th Cir. 1986), *overruled on other grounds by Denton v. Hernandez*, 504 U.S. 25 (1992)).

[13] *Id.* (citing *Wilson*, 926 F.2d at 482–83; *Williams v. Luna*, 909 F.2d 121, 124 (5th Cir. 1990)).

[14] *Jackson v. Vannoy*, 49 F.3d 175, 176–77 (5th Cir. 1995); *Moore v. Mabus*, 976 F.2d 268, 269 (5th Cir. 1992)

[15] *Moore*, 976 F.2d at 270. This framework "accords judges not only the authority to dismiss a claim based on an indisputably meritless legal theory, but also the unusual power to pierce the veil of the complaint's factual allegations and dismiss those claims whose factual contentions are clearly baseless." *Denton v. Hernandez*, 504 U.S. 25, 32 (1992).

[16] *In re Katrina Canal Breaches Litigation*, 495 F.3d 191, 205 (5th Cir. 2007) (citation, footnote, and quotation omitted).

[17] *Davis*, 157 F.3d at 1005 (quoting *McCormick v. Stalder*, 105 F.3d 1059, 1061 (5th Cir. 1997)).

district court ultimately finds is correctly resolved against the plaintiff, dismissal under Rule 12(b)(6) is appropriate; however, dismissal under the section 1915(d) standard is not."[18]   A prisoner's *in forma pauperis* complaint that fails to state a claim may be dismissed *sua sponte* at any time.  28 U.S.C. § 1915(e)(2); 42 U.S.C. § 1997e(c)(1).

### B.  Summary Judgment

Defendants have moved for summary judgment based on qualified immunity. Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[19] "Rule 56(c) mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial."[20] A party moving for summary judgment bears the initial burden of demonstrating the basis for summary judgment and identifying those portions of the record, discovery and any affidavits supporting the conclusion that there is no genuine issue of material fact.[21] If the moving party meets that burden, then the nonmoving party must use evidence cognizable under Rule 56 to demonstrate the existence of a genuine issue of material fact.[22]

A genuine issue of material fact exists if a reasonable jury could return a verdict for the nonmoving party.[23] The substantive law identifies which facts are material.[24] Material facts are not genuinely disputed when a rational trier of fact could not find for the nonmoving party upon a

---

[18] *Moore*, 976 F.2d at 269.

[19] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing FED. R. CIV. P. 56(c))).

[20] *Id.*

[21] *Id.* at 323.

[22] *Id.* at 324.

[23] *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1996).

[24] *Id.*

review of the record taken as a whole.[25] "[U]substantiated assertions," "conclusory allegations," and merely colorable factual bases are insufficient to defeat a motion for summary judgment.[26] In ruling on a motion for summary judgment, a court may not resolve credibility issues or weigh evidence.[27] Further, a court must assess the evidence, review the facts, and draw any appropriate inferences based on the evidence in the light most favorable to the party opposing summary judgment.[28] Yet, the court only draws reasonable inferences in favor of the nonmovant "when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts."[29]

After the movant demonstrates the absence of a genuine dispute, the nonmovant must articulate specific facts and point to supporting, competent evidence that may be presented in a form admissible at trial.[30] Such facts must create more than "some metaphysical doubt as to the material facts."[31] When the nonmovant will bear the burden of proof at trial on the dispositive issue, the moving party may simply point to insufficient admissible evidence to establish an essential element of the nonmovant's claim in order to satisfy its summary judgment burden.[32] Unless there is a genuine issue for trial that could support a judgment in favor of the nonmovant, summary judgment must be granted.[33]

---

[25] *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Equal Emp't Opportunity Comm'n v. Simbaki, Ltd.*, 767 F.3d 475, 481 (5th Cir. 2014).
[26] *See Anderson*, 477 U.S. at 249-50; *Hopper v. Frank*, 16 F.3d 92, 97 (5th Cir. 1994).
[27] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398-99 (5th Cir. 2008).
[28] *See Tolan v. Cotton*, 572 U.S. 650, 656 (2014); *Daniels v. City of Arlington*, 246 F.3d 500, 502 (5th Cir. 2001).
[29] *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (*citing Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).
[30] *See Lynch Props., Inc. v. Potomac Ins. Co. of Ill.*, 140 F.3d 622, 625 (5th Cir. 1998); FED. R. CIV. P. 56 (c)(1)(A) & c(2).
[31] *Matsushita*, 475 U.S. at 586.
[32] *See Celotex*, 477 U.S. at 322-25; FED. R. CIV. P. 56(c)(1)(B).
[33] *See Little*, 37 F.3d at 1075-76.

Defendants seek summary judgment as to plaintiff's claims for monetary relief based on qualified immunity. The analysis for summary judgment on the issue of qualified immunity differs in some respects from the traditional summary judgment analysis. "Qualified immunity is an immunity from suit rather than a mere defense to liability."[34] "A good faith assertion of qualified immunity alters the usual summary judgment burden of proof, shifting to the plaintiff the burden to show that the defense is not available."[35] "The plaintiff must rebut the defense by establishing that the official's allegedly wrongful conduct violated clearly established law and that genuine issues of material fact exist regarding the reasonableness of the official's conduct."[36] To negate a defense of qualified immunity and avoid summary judgment, the plaintiff need not present "absolute proof," but must offer more than "mere allegations."[37]

The plaintiff must make two showings to negate qualified immunity.  First, the plaintiff must show the defendant violated his constitutional rights.[38] Second, the plaintiff must show that the asserted right was clearly established at the time of the alleged misconduct.[39] This second inquiry turns on the "objective legal reasonableness of the action, assessed in light of the legal rules that were *clearly established* at the time [the action] was taken."[40] The United States Supreme Court has instructed courts "not to define clearly established law at a high level of generality."[41] The inquiry focuses "not only [on] whether courts have recognized the existence of a particular constitutional right, but also on whether that right has been defined with sufficient clarity to enable a reasonable official to assess the lawfulness of his conduct."[42] If and only if the facts create a

---

[34] *Pearson v. Callahan*, 555 U.S. 223, 237 (2009).
[35] *King v. Handorf*, 821 F.3d 650, 653-54 (5th Cir. 2016) (internal quotation marks and citations omitted).
[36] *Id.* at 654 (quoting *Gates v. Texas Dep't of Protective & Regulatory Servs.*, 537 F.3d 404, 419 (5th Cir. 2008)).
[37] *Id.* (quoting *Manis v. Lawson*, 585 F.3d 839, 843 (5th Cir. 2009)).
[38] *Pearson*, 555 U.S. at 232.
[39] *Id.*
[40] *Id.* at 244 (citing *Wilson v. Layne*, 526 U.S. 603, 614 (1999) (emphasis added)).
[41] *Mullenix v. Luna*, 136 S. Ct. 305, 308 (per curiam).
[42] *McClendon v. Columbian*, 305 F.3d 314, 322-23 (5th Cir. 2002) (en banc)

genuine dispute as to whether a constitutional violation occurred, then the court will "ask whether the right was clearly established" at the time of the violation.[43] In other words, even "[i]f the official's conduct was unconstitutional, [the court] determine[s] whether it was nonetheless objectively reasonable in light of judicial precedent at the time of the infraction."[44] If it was objectively reasonable, the defendant is not liable.

## III.    ANALYSIS

### A.    First Amendment "Free Exercise" Claims

Geisler seeks monetary damages based on a claim that defendants impeded his free exercise of religion by denying him access to services and counseling and by depriving him of kosher meals required by his Messianic Jewish faith, in violation of the First Amendment to the United States Constitution.

"The Constitution requires that 'reasonable opportunities must be afforded to all prisoners to exercise . . . religious freedom.'"[45] While inmates clearly retain some protections afforded by the First Amendment, the rights of all prisoners are restricted. "'Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system.'"[46] The propriety of limiting prisoners' First Amendment rights "arise[s] both from the fact of incarceration *and from valid penological objectives*—including deterrence of crime, rehabilitation of prisoners, and institutional security."[47] Evaluation of these valid penological objectives is committed to the judgment of prison administrators, and courts must afford deference to their evaluation.[48] Thus, when the action of

---

[43] *Id.* at 323.
[44] *Kelly v. Foti*, 77 F.3d 819, 821 (5th Cir. 1996).
[45] *Green v. McKaskle*, 788 F.2d 1116, 1126 (5th Cir. 1986) (quoting *Cruz v. Beto*, 405 U.S. 319, 322 n.2 (1972)).
[46] *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987) (quoting *Price v. Johnson*, 334 U.S. 266, 285 (1948)).
[47] *Id.* (emphasis added).
[48] *Id.* at 349.

prison officials impinges on prisoners' constitutional rights, "the regulation is valid if it is reasonably related to legitimate penological interests."[49]

Prison regulations that allegedly impinge on fundamental constitutional rights are reviewed under the deferential standard set forth in *Turner v. Safley*, 482 U.S. 78 (1987). In *Turner*, the Court explained that a prison regulation that impinges on inmates' religious rights is valid if it is "reasonably related to legitimate penological interests."[50] *Turner* employs a four-factor test to resolve this inquiry: (1) whether there is a rational relationship between the regulation and the legitimate government interest advanced (rational connection); (2) whether the inmates have available alternative means of exercising the right (alternative means); (3) the impact of the accommodation on prison staff, other inmates, and the allocation of prison resources generally (impact of accommodation); and (4) the regulation is not an exaggerated response to prison concerns (exaggerated response).[51] The court need not "weigh evenly, or even consider, each of these factors," as **rationality** is the controlling standard.[52]

### 1.    Religious Services and Counseling

Geisler alleges that the Terrebonne jail offered no formal religious services and that the only way for him to practice his Messianic Jewish faith at the Terrebonne jail was to read his Bible (which he purchased), pray by himself, or pray with other people in a prayer circle. He also alleges that he was denied religious counseling.

Denying specific religious services for a small segment of the population is not unconstitutional when an inmate can practice his religion individually.[53] In *Freeman v. Tex. Dep't*

---

[49] *Id.*
[50] 482 U.S. at 87.
[51] *Id.* at 89-91.
[52] *Scott v. Miss. Dep't of Corr.*, 961 F.2d 77, 81 (5th Cir. 1992) (emphasis added).
[53] *Baranowski v. Hart*, 486 F.3d 112, 122 (5th Cir. 2007)

*of Crim. Justice*, the Fifth Circuit upheld the Texas Department of Criminal Justice's policy of offering to all inmates throughout the state's prisons weekly religious services tailored to five major religious groups, with supplemental services for Church of Christ members when feasible.[54] The court held that "staff and space limitations, as well as financial burdens, are valid penological interests."[55] Further, the prison system's policy of offering Christian, non-Roman Catholic services provided "'alternative means' of exercising their religious beliefs" to many Church of Christ member inmates.[56] The Fifth Circuit rejected the inmates' argument that the prison system must provide religious services that specifically included every element of the Church of Christ's rituals at each of the system's 41 prisons. According to the Court, "[t]he pertinent question is not whether the inmates have been denied specific religious accommodations, but whether, more broadly, the prison **affords the inmates *opportunities* to exercise their faith**.[57] The *Freeman* court noted that requiring the facility to provide plaintiffs with weekly services specially tailored to the Church of Christ "would spawn a cottage industry of litigation and could have a negative impact on prison staff, inmates, and prison resources" and threaten prison safety.[58]

In the present matter, Geisler testified at the *Spears* hearing that Messianic Jews follow the teachings of the Bible, particularly those of the Old Testament. He further testified that Messianic Jews practice their faith by attending synagogue and/or church services, reading the Bible,

---

[54] 369 F.3d 854, 860 (5th Cir. 2004).

[55] *Id.* at 861 (5th Cir. 2004) (citing *Ganther v. Ingle*, 75 F.3d 207, 211 (5th Cir. 1996)); *see also Turner*, 482 U.S. at 89 (prison regulations that impinge on inmates' constitutional rights are valid if reasonably related to legitimate penological interests).

[56] *Freeman*, 369 F.3d at 861-62 (citing *O'Lone*, 482 U.S. at 351-53).

[57] *Id.* at 861-62.

[58] *Id.* at 862 (citing *Turner*, 482 U.S. at 90) ("'When accommodation of an asserted right will have a significant "ripple effect" on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of correctional officials.'"); *see also Baranowski* 486 F.3d at 120-121 (finding no violation of free exercise rights where facility did not provide Jewish holiday services, considering it sufficient that inmate was allowed to pray in his cell); *Adkins v. Kaspar*, 393 F.3d 559, 565 (5th Cir. 2004) (finding no violation of free exercise rights where members of Yahweh Evangelical Assembly were not permitted to assemble on every Sabbath or holy day, because inmates had alternative means of exercising their religion, including but not limited to worship alone in their cells).

engaging in solitary prayer and joining with others for group prayer in "prayer circles." Despite plaintiff's testimony that the Terrebonne jail did not provide formal religious services for Messianic Jewish inmates, his testimony indicates that the prison provided him with multiple "alternative avenues" to exercise his religion, including the ability to purchase and read his own Bible and opportunities to engage in both solitary and group prayer with other inmates. On the face of the pleadings, the Terrebonne jail complied with the law and Geisler fails to state a claim. Geisler has not plausibly alleged how the Terrebonne jail's failure to provide formal religious services prevented him from engaging in his religious practices. To the extent plaintiff complains that the Terrebonne jail violated his First Amendment rights by not providing religious services specially tailored to the Messianic Jewish religion, the Fifth Circuit has rejected that argument. Accordingly, I recommend that plaintiff's denial of religious services claim be dismissed as frivolous and for failure to state a claim under 28 U.S.C. § 1915A(b)(1) and § 1915(e)(2)(B).

Even if Geisler's claim regarding the denial of religious services could survive screening under 28 U.S.C. § 1915, summary judgment is proper as a matter of law based on qualified immunity. Geisler has failed to point to any clearly established constitutional right to a certain type or number of public religious services. To the contrary, it is clearly established that legitimate penological interests in safety, security, morale and budgetary constraints justify restrictions on "in person" religious services in these particular circumstances.[59] Based on the facts, the law and the argument, I recommend that the court find that, even if Geisler states a non-frivolous claim for violation of his right to free exercise of his religion based on the lack of formal religious services for Messianic Jewish inmates, he has not overcome the defendants' right to qualified immunity at

---

[59] *Freeman*, 369 F.2d at 861-862; *Baranowski*, 486 F.3d at 121; *Kaspar*, 393 F.3d at 565.

the summary judgment stage.  Accordingly, defendants are entitled to judgment as a matter of law that Geisler's claims for damages are barred by qualified immunity.

### 2. Kosher Diet

Geisler complains that defendants violated his right to freely exercise his Messianic Jewish religion when they did not provide him with a proper kosher diet at the Terrebonne jail.

The Fifth Circuit has, on several occasions, addressed the First Amendment claims of prisoners seeking diets tailored to their specific religious beliefs on several occasions. In *Udey v. Kastner*, 644 F. Supp. 1441, 1445 (E.D. Tex.), *aff'd*, 805 F.2d 1218 (5th Cir. 1986), the Fifth Circuit addressed the First Amendment claim of a federal prisoner who asked to be provided with a diet consisting of organic fruits, juices, vegetables and meats; raw milk; and distilled water in accordance with his religious beliefs. The federal prison officials declined the request, the prisoner refused to eat the food provided and the prisoner was ultimately force fed through nasal tubes.[60] The district court held that the prison was not required to accommodate his requests, stating that "Udey's religious dietary demands place an undue burden on the penal system to the extent that there is good reason not to provide him with his requested religious diet."[61] On appeal, the Fifth Circuit expressed concern about the potential undue cost and administrative burden caused by the proliferation of special religious dietary requests and the unavoidable religious entanglement prisons would experience in drawing distinctions among various free exercise claimants.[62] The Fifth Circuit affirmed the district court's judgment in favor of the defendant prison officials.[63]

In *Kahey v. Jones*, 836 F.2d 948 (5th Cir. 1988), a Muslim prisoner appealed the district court's grant of summary judgment denying her demand to have the prison prepare a non-pork

---

[60] *Udey*, 805 F.2d at 1219.
[61] *Udey*, 644 F. Supp. at 1442.
[62] *Udey*, 805 F.2d at 1221.
[63] *Id.*

menu specially tailored to accommodate her practice of Islam.[64] The prisoner claimed that her religion prevented her from eating products containing pork or eating any food or using utensils that contacted pork or pork byproducts in the cooking or serving process. Prison officials responded by providing the prisoner with a protein substitute whenever pork was served with a prison meal, and certain dishes like beans were prepared both with and without pork.[65] Completely fulfilling the prisoner's request would have required special food and individualized processing and containers to completely avoid pork-contamination, and would have imposed an undue burden on the facility.[66]

The Fifth Circuit affirmed summary judgment for the prison officials, stating that it had "already ruled [in *Udey*] that prisons **need not respond to particularized religious dietary requests**."[67] The Fifth Circuit applied the factors set forth by the Supreme Court in *Turner*. The court found with respect to the first factor that there was a rational relationship between the prison regulation – "to provide inmates balanced, uniform meals, with protein substitutes for pork and pork products, reserving special diets only for medical reasons" – and the legitimate governmental interest that justifies it – "running a simplified prison food service rather than a full-scale restaurant."[68] As to the second factor, without denigrating the significance to the inmate of a kosher diet, the Fifth Circuit stated that the prisoner acknowledged that not all Muslims adhere to the same diet and that she was not deprived of alternative means of freely exercising her religion.[69] With respect to the third factor, the impact of accommodation on others and prison resources, the court noted the understandable reluctance of prison officials to provide special storage facilities, utensils,

---

[64] 836 F.2d at 949.
[65] *Id.*
[66] *Id.* at 949-950.
[67] *Id.* at 950 (emphasis added).
[68] *Id.*
[69] *Id.* at 950-51.

and preparation efforts for each request.[70] The court further noted that if other prisoners were not similarly accommodated, they could perceive that the plaintiff was being favored, which would adversely impact prison morale. *Id.* As for the final factor, the court found that purchasing, storing, and preparing food for one prisoner out of hundreds would impose more than *de minimis* expense on the prison. *Id.*

In *Baranowski v. Hart*, 486 F.3d 112 (5th Cir. 2007), a Jewish inmate appealed the district court's dismissal on summary judgment of his First Amendment claim seeking a kosher diet in prison "conforming with the dietary laws of Judaism."[71] Prison officials submitted evidence that kosher meals were very costly in comparison to the other meals served to prisoners in the Texas prison system.[72] Prisoners were permitted to select a regular tray, a meat-free tray, or a pork-free tray, and supplemental items were provided if the inmate did not choose to eat meat or pork.[73] Citing its holdings in *Udey* and *Kahey*, the Fifth Circuit stated that it had "already ruled that prisons need not respond to particularized religious dietary requests to comply with the First Amendment."[74] *Id.* The court analyzed the summary judgment evidence under the four *Turner* factors and affirmed the district court's dismissal of the plaintiff's First Amendment claim "[f]or the reasons stated by the courts in *Kahey* and *Udey*," stating that "denial of a kosher diet does not violate Baranowski's free exercise rights." *Id.*

Finally, the Fifth Circuit in *Omran v. Prator*, 674 F. App'x 353 (5th Cir. 2016), upheld the district court's dismissal on summary judgment of a Muslim inmate's First Amendment claim that he was denied halal and/or kosher food in accordance with the tenets of his religion while

---

[70] *Id.* at 951.
[71] 486 F.3d at 116.
[72] *Id.* at 118.
[73] *Id.*
[74] *Id.*

incarcerated. *Id.* at 355. The district court applied *Turner* in assessing the summary judgment evidence, including the prison's attempts to accommodate the dietary needs of Jewish and Muslim prisoners by not serving any pork products in the jail, to avoid issues with service of pork or cross-contamination of other foods, and defendants' budgetary and morale reasons for not catering to the specific needs of each inmate. The court found that there will almost certainly be inmates such as Plaintiff who will be housed there from time to time who have religious preferences for additional limitations or requirements regarding their diet, but jail administrators have offered reasons including budget and morale that entitle them to summary judgment on Plaintiff's First Amendment claim. In a per curiam opinion, the court cited the Fifth Circuit precedent established by *Kahey* and upheld in *Baranowski*, stating that "*Baranowski* resolves the immediate appeal with regard to [Omran's] First Amendment claim."[75]

Under 28 U.S.C. § 1915A(b)(1) and § 1915(e)(2)(B), Geisler's allegations regarding his dietary requests, as expanded upon during his *Spears* hearing, fail to state a claim upon which relief may be granted. During his *Spears* hearing, Geisler testified that he was able to eat beans and rice provided to him in compliance with his kosher diet and that he was able to purchase additional kosher items at the commissary. Even accepting the facts as alleged by Geisler, there is a rational relationship between the Terrebonne jail's food regulations and a legitimate government interest in safety and budgetary restraints. Geisler admitted during his *Spears* hearing that even though he questioned certain items as not being kosher, other items the jail provided were sufficient to meet the needs of his religious beliefs. Geisler had access to items at the commissary that he considered sufficiently kosher. The jail's efforts satisfy the constitutional standard for ensuring Geisler's right to the free exercise of his religion, and defendants are entitled to judgment as a

---

[75] *Id.*

matter of law dismissing Geisler's claim as it relates to provision of a kosher diet. I recommend that Geisler's First Amendment claim challenging his denial of kosher meals be dismissed with prejudice pursuant to 28 U.S.C. § 1915A(b)(1) and § 1915(e)(2)(B).

Even if Geisler's allegations regarding the denial of a kosher diet could survive screening under 28 U.S.C. § 1915, the defendants would be entitled to summary judgment as a matter of law on their claim of qualified immunity. The undisputed facts show that Geisler was one of more than 700 inmates and was the only one to request a kosher diet. Geisler made that request for the first time after he had already been in the jail for three months. Upon receiving Geisler's request for a kosher diet, Terrebonne jail sent the request to Correctional Food Services, which subsequently provided the jail with a kosher diet for Geisler prepared by a food service/nutrition consultant. ECF Nos. 34-7, 34-8, 34-10. The jail served Geisler meals designated by the Correctional Food Services as kosher. Geisler expressed suspicions regarding certain items on his kosher food tray, but he offers no evidence in opposition to the evidence adduced by defendants at summary judgment to establish that the items provided were not, in fact, kosher. Other district courts within the Fifth Circuit have rejected unsubstantiated claims by prisoners that they can tell the difference between pork and pork substitutes.[76] In addition to the special diet prepared for him by the food service/nutrition consultant Barbara Wakeen, Geisler purchased kosher food for himself. Geisler has not adduced any evidence or made any argument to negate qualified immunity. Geisler has not shown that defendants violated his constitutional rights or that the asserted right was clearly established at the time of the complaint. Accordingly, I further recommend that defendants' summary judgment motion based on defendants' qualified immunity be granted.[77]

---

[76] See *Omar v. Casterline*, 414 F. Supp. 2d 582, 590 (W.D. La. 2006).
[77] See *Pearson*, 555 U.S. at 232.

B.    **State Law Slander/Defamation Claim**

Geisler complains that he was slandered on Facebook and in a newspaper for filing the present lawsuit. ECF No. 14, at 3. Geisler testified that an attorney for defendants slandered him in the newspaper after he filed the present lawsuit. Plaintiff stated that his mother informed him that a newspaper article was posted on Facebook and reflected the opinion of defendants' attorney that the religious claims made in this lawsuit lacked merit. Plaintiff stated that the attorney went on the record in the article, stating that the diet plaintiff received at the Terrebonne jail "is kosher enough for rest of world, just not for Drake Geisler." Geisler testified that he suffered no physical injuries from the statements made in the newspaper article; however, his mother was embarrassed after "seeing him file lawsuit for something he is entitled to" and plaintiff was embarrassed as a result of his mother's embarrassment. He stated that the article was "making it look like I am in the wrong."

"To the extent slander can support a claim under 42 U.S.C. § 1983, plaintiff must allege facts sufficient to state a claim under that statute."[78]  In order to establish a defamation cause of action under Louisiana law, plaintiff must prove four elements: "(1) a false and defamatory statement concerning another; (2) an unprivileged publication to a third party; (3) fault (negligence or greater) on the part of the publisher; and (4) resulting injury."[79]  Louisiana law affords police officers a qualified privilege against defamation actions.  At a minimum, Geisler has failed to allege injury for purposes of a slander/defamation claim. I recommend that his claim be dismissed for failure to state a claim.

---

[78] *Griggs v. Corsicana Police Dep't*, 2004 WL 62581, at *2 (N.D. Tex. Jan. 12, 2004) (citing *Mowbray v. Cameron County,* 274 F.3d 269, 277 (5th Cir. 2001), *cert. denied,* 535 U.S. 1055 (2002)).
[79] *Thorn v. McGary*, 684 F. App'x 430, 435 (5th Cir. 2017) (citing *Trentecosta v. Beck*, 703 So. 2d 552, 559 (La. 1997); *Lee v. Pennington*, 830 So. 2d 1037, 1045 (La. Ct. App. 2002)).

Further, because I recommend that all federal law claims be dismissed in this matter, the court has discretion either to decline or exercise supplemental jurisdiction over plaintiff's state law claims, 28 U.S.C. § 1367(c)(3), considering the statutory provisions of 28 U.S.C. § 1367(c) and the balance of the common law factors of judicial economy, convenience, fairness and comity.[80] I recommend that, if the state law claim is not dismissed, the court decline to exercise supplemental jurisdiction over Geisler's state law claim for slander.

###   C.    Injunctive Relief

In his complaint, in addition to damages, Geisler asks this court to grant injunctive relief requiring the Terrebonne jail to provide him with a proper kosher diet and religious and mental health counseling. ECF No. 1 at p. 5, ¶ V. After he filed the present lawsuit on November 14, 2019, Geisler was transferred first to the Union Parish Detention Center and then to the Claiborne Parish Detention Center, where he is currently incarcerated.

"A prisoner's transfer to another facility renders his claims for declaratory and injunctive relief moot."[81] Even if Geisler asked for an injunction based on the possibility that he might someday be housed at the Terrebonne jail again, he does not articulate any particular facts in his written submissions or *Spears* testimony that suggest there is a realistic likelihood of that happening. The mere possibility that plaintiff might someday be transferred back to the Terrebonne

---

[80] *Carnegie-Mellon University v. Cohill*, 484 U.S. 343, 350–51 (1988); *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966); *Heggemeier v. Caldwell Cty., Texas*, 826 F.3d 861, 872–73 (5th Cir. 2016); *Enochs v. Lampasas Cty.*, 641 F.3d 155, 158–59 (5th Cir. 2011); *Brookshire Bros. Holding v. Dayco Prod., Inc.*, 554 F.3d 595, 602 (5th Cir. 2009); *Batiste v. Island Records, Inc.*, 179 F.3d 217, 227 (5th Cir. 1999).

[81] *Omran v. Prator*, 2015 WL 9647662, at *2 (W.D. La. July 10, 2015), *report and recommendation adopted*, 2016 WL 75088 (W.D. La. Jan. 6, 2016), *aff'd*, 674 F. App'x 353 (5th Cir. 2016) (citing *Herman v. Holiday*, 238 F.3d 660, 665 (5th Cir. 2001) (claims for injunctive and declaratory relief based on exposure to asbestos were mooted by transfer to another prison)) (internal quotations omitted); *see also Cooper v. Sheriff, Lubbock County*, 929 F.2d 1078, 1084 (5th Cir. 1991) (claims for injunctive relief based on denial of food at prior jail were moot upon inmate's transfer to different prison).

jail "is too speculative to warrant relief."[82] Thus, plaintiff's claims for injunctive relief should be denied as moot.

## RECOMMENDATIONS

For the foregoing reasons, **IT IS RECOMMENDED** that plaintiff's claim that he was denied his First Amendment right to the free exercise of religion by being denied religious services be **DISMISSED WITH PREJUDICE** as legally frivolous under 28 U.S.C. § 1915(e)(2) and 42 U.S.C. § 1997e(c)(1), and alternatively, barred by qualified immunity.

**IT IS FURTHER RECOMMENDED** that plaintiff's claim that he was denied his First Amendment right to the free exercise of religion by being denied a kosher diet be **DISMISSED WITH PREJUDICE** as legally frivolous under 28 U.S.C. § 1915(e)(2) and 42 U.S.C. § 1997e(c)(1), and alternatively, barred by qualified immunity.

**IT IS FURTHER RECOMMENDED** that Plaintiff's claim for slander and/or defamation be **DISMISSED WITH PREJUDICE** for failure to state a claim, or alternatively, if the Court dismisses the federal claims in accordance with my recommendation, it decline to exercise jurisdiction over plaintiff's state law claim for slander/defamation and dismiss same without prejudice.

**IT IS FURTHER RECOMMENDED** that plaintiff's claim for injunctive relief be **DISMISSED AS MOOT**, as he is no longer incarcerated at the Terrebonne jail, where he alleges his constitutional rights were denied.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from

---

[82] *Herman*, 238 F.3d at 665.

attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc) (citing 28 U.S.C. § 636(b)(1)).[83]

New Orleans, Louisiana, this ___8th___ day of September, 2020.

DONNA PHILLIPS CURRAULT
UNITED STATES MAGISTRATE JUDGE

---

[83] *Douglass v. United Servs. Auto. Ass'n,* 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc) (citing 28 U.S.C. § 636(b)(1)). *Douglass* referred to the previously applicable ten-day period for filing of objections, which was extended to fourteen days by amendment effective December 1, 2009, 28 U.S.C. § 636(b)(1).